**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **REBECCA SEVILLA,** | : | **Civil No. 1:22-CV-881** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **KILOLO KIJAKAZI,** | : | |
| **Acting Commissioner of Social Security[1],** | : | |
| | : | |
| **Defendant** | : | |

**MEMORANDUM OPINION**

## I.  Introduction

This is Rebecca Sevilla's second application for disability insurance benefits pursuant to Title II of the Social Security Act. Previously Sevilla had applied for such benefits, but her application was denied by an Administrative Law Judge (ALJ) on October 2, 2018. (Tr. 66-85).

In her current application for disability insurance benefits, Sevilla alleged an onset of disability on October 3, 2018, the day after the denial of her prior application. (Tr. 16). For purposes of the Act, Sevilla's date last insured was

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g) Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

December 31, 2018. (Tr. 18). Therefore, the temporal scope of this disability appeal is narrowly defined and is confined to a three-month period of eligibility spanning from October through December 2018.

Focusing on this pertinent time period, an ALJ conducted a hearing regarding Sevilla's second disability application on March 15, 2021. (Tr. 31-65). At this hearing Sevilla testified and reported that she was actually employed part-time up to 16 hours per week as a direct care worker for elderly clients. (Tr. 42). Following this hearing, on May 26, 2021, the ALJ entered a decision denying Sevilla's disability application, finding that she could perform some of her past relevant work despite her impairments. (Tr. 13-31).

Sevilla now appeals this decision, advancing two substantive arguments. First, she alleges that the ALJ's residual functional capacity assessment failed to account for what were described as mild mental and emotional impairments. In addition, Sevilla argues that the ALJ's residual functional capacity evaluation did not adequately take into account her hearing impairments. Sevilla advanced this argument even though contemporaneous medical records indicated that in February of 2019, shortly after her date last insured, she denied any pain, drainage, or dizziness, and reported "significant improvement in hearing." (Tr. 387).

Aside from these merits-based contentions, Sevilla also asserts that there is a structural legal flaw in the appointment process for the Commissioner of Social Security which also entitles her to a remand of her case. However, when considering this Social Security appeal, we are enjoined to apply a deferential standard of review, one which simply calls for a determination of whether substantial evidence supported the ALJ's decision. Mindful of the fact that, in this context, substantial evidence is a term of art which "means only— 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' " Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019), we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner denying this claim.

## II.    Statement of Facts and of the Case

On October 29, 2019, Rebecca Sevilla applied for disability insurance benefits under Title II of the Social Security Act alleging an onset of disability on October 3, 2018. (Tr. 16). This was Sevilla's second disability insurance benefit application, her prior application having been denied by an ALJ on October 2, 2018. (Tr. 66-85). Sevilla was born in 1965 and was approximately 54 years old at the time of the alleged onset of her disability. (Tr. 86). She had a high school education, and had attained an associate's degree. (Tr. 41). Her prior employment history included work

3

as a collections agent and a school secretary. (Tr. 27). Moreover, at the time of the administrative proceedings on this disability application, Sevilla was employed part-time, working 16 hours per week as a direct care worker for elderly clients. (Tr. 42).

With respect to this, Sevilla's second application for disability insurance benefits under Title II of the Social Security Act, the plaintiff's date last insured was December 31, 2018. (Tr. 18). Therefore, her claimed date of onset—October 3, 2018—and her date last insured—December 31, 2018—defined the scope of Sevilla's application for disability insurance benefits since she was obliged to show that she met the criteria for disability after her date of onset but before her date last insured.

With this disability determination defined by, and confined to, this roughly three-month period in 2018, Sevilla alleged that she was disabled due to an array of physical and emotional impairments. However, on appeal she only challenges two aspects of the ALJ's decision. Specifically, Sevilla alleges that the ALJ's residual functional capacity assessment failed to account for what were described as mild mental and emotional impairments and did not adequately take into account her hearing impairments.

With respect to these two issues, Sevilla's medical history was marked by sparse clinical evidence supporting her claim of disabling impairment. Moreover,

4

there was no medical opinion which found Sevilla to be disabled. Therefore, Sevilla's disability application was largely unsupported by any clinical or opinion evidence.

Thus, the clinical record revealed that Sevilla had experienced some chronic hearing difficulties since 2013. (Tr. 394-95). As reported by Sevilla, these hearing problems were marked by a low droning sound, which sometimes seemed more pronounced in quiet settings. (Tr. 47, 395). Sevilla treated this condition over time, and shortly after her date last insured in January of 2019 underwent a right revision tympanoplasty[2] with ossicular chain reconstruction. Following this procedure, in February of 2019 Sevilla denied any pain, drainage, or dizziness, and described "significant improvement in hearing" (Tr. 387). Likewise in March of 2019, Sevilla reported that she noted improvement in hearing from before and had no drainage or pain. (Tr. 384).

As for Sevilla's emotional impairments, the plaintiff testified that she had been receiving counseling on a weekly and bi-weekly basis since 2017 to address depression symptoms she had experienced following the death of her father and

---

[2] Tympanoplasty is microsurgery — surgery using a microscope or endoscope— to fix holes in the eardrum that do not heal on their own. See https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/ tympanoplasty

some familial strife with her daughters. (Tr. 52-56). In addition, Sevilla indicated that she had been prescribed Zoloft for her depression. (Tr. 57). Sevilla's counsellor confirmed both this diagnosis and course of treatment. (Tr. 356). However, the medical experts who examined Sevilla's treatment records unanimously agreed that these emotional conditions resulted in nothing more than a mild degree of impairment. For example, in February of 2020, Dr. Paul Taren, a state agency expert, reviewed Sevilla's treatment records and found that her depression was "a non-severe impairment as eviden[ced] by clinical or medical history." (Tr. 91). According to Dr. Taren, this condition had no impact on Sevilla's ability to understand and apply information, or interact with others, and only resulted in a mild impairment of her ability to concentrate, persist, or maintain pace and adapt to workplace changes. (Id.) In September of 2020, a second state agency expert, Dr. Frank Mrykalo, echoed these findings, and concluded that Sevilla's emotional impairments were not severe in nature. (Tr. 108-09). The administrative record contains no other contrasting medical opinions regarding Sevilla's emotional impairments.

Beyond this clinical and medical opinion evidence, Sevilla's self-reported activities of daily living indicated a capacity for work. Thus, Sevilla reported performing part-time employment, hobbies, gardening, preparing meals, shopping,

and cleaning. (Tr. 42, 286-93, 382-406). It was on this medical record that Sevilla's disability application came to be heard by the ALJ.

The ALJ conducted a hearing on this disability application on March 15, 2021. (Tr. 31-65). Sevilla and a vocational expert both testified at this hearing. In her testimony, Sevilla acknowledged that she had been working part-time at the time of this hearing. (Tr. 42). Following this hearing, on May 26, 2021, the ALJ issued a decision denying this application for benefits. (Tr. 13-31). In that decision, the ALJ first defined the narrow scope of Sevilla's claim, stating that her alleged date of onset was October 3, 2018, and her date last insured was December 31, 2018. (Tr. 16, 18). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Sevilla's severe impairments included her hearing loss, but found, consistent with the medical opinion consensus, that her emotional impairments were not severe. (Tr. 19).

On this score, the ALJ's decision provided the following careful explanation of this severity determination as it related to Sevilla's emotional impairments:

> The undersigned considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing the claimant's residual functional capacity. The claimant's medically determinable mental impairments of major depressive disorder and anxiety disorder considered singly and in combination, did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and were therefore nonsevere. As related to the mental health allegations, prior to the onset date, the

7

claimant had sought mental health treatment with Sloan Svadeba-Cummings, M.S., L.P.C, N.C.C. because she was experiencing depression and low self-esteem. She reported many depressive symptoms and regularly reported difficulty with daily activities due to her physical issues. She was taking psychotropic medication prescribed by her primary care physician at that time (Exhibit B2F). During the relevant period, the records show that in 2020, the claimant was continuing to seek mental health treatment with Sloan Svadeba-Cummings, M.S., L.P.C, N.C.C. (Exhibit B7F). The claimant reported having issues with family conflict, dizziness, physical pain, and finances. These record note that her "distress of impairment" was moderate and that she appeared anxious (Exhibit B7F). Throughout 2020 into 2021, the claimant reported issues with coping, although she also reported that she was pleased to have found part time work. She noted that she was partaking in physical therapy for her balance issues. Clinical observations routinely and regularly note normal findings except for the claimant appearing as mildly anxious. Her appearance, behavior, affect, thought processes, insight, sleep, orientation, speech, mood, thought content, judgment, appetite were all within normal limits regularly and consistently (Exhibits B7F-B8F). The claimant has not participated in any intensive outpatient programs, required inpatient treatment, and has not been recommended for more frequent treatment. Both State agency psychological consultants reviewed the record and found that there were no severe mental health impairments. Upon initial review and upon reconsideration, Dr. Paul Taren and Dr. Frank Mrykalo both opined that the claimant had no limitations in the ability to understand, remember, or apply information, or in the ability to interact with others. They both assessed mild limitations in the ability to concentrate, persist or maintain pace, and mild limitations in the ability to adapt or manage oneself (Exhibits B2A; B4AA). These opinions are persuasive as seen in the above summarized mental treatment notes at Exhibits B2F; B7F; and B8F that routinely documented normal findings. The claimant has also been able to work parttime with others in a home care setting. Although not substantial gainful activity, this is evidence of higher function than alleged. This evidence does not support that the mental health impairments are severe.

(Tr. 19-20). At Step 3, the ALJ determined that none of these impairments met or medically equaled the severity of one of the listed impairments. (Tr. 21-22).

Between Steps 3 and 4 the ALJ concluded that Sevilla retained the following residual functional capacity ("RFC"):

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she can only occasionally climb ramps and stairs, climb ladders, ropes, and scaffolds, balance, stoop, kneel, crouch, and crawl. The claimant must avoid concentrated exposure to noise above a moderate level, vibration, fumes, odors, dusts, gases, poor ventilation, other pulmonary irritants, and hazards such as unprotected heights and dangerous moving machinery.

(Tr. 22).

This RFC made some accommodations for Sevilla's hearing impairments since it provided that she must avoid concentrated exposure to noise above a moderate level. In reaching this RFC determination, the ALJ reviewed the clinical and medical opinion evidence pertaining to the relevant time frame for this claim, as well as Sevilla's self-reported activities of daily living.

With respect to Sevilla's hearing impairments, the ALJ aptly noted that:

> Overall, the records supports longstanding issues/residuals related to her ears. Over five years ago, the claimant had undergone right sided revision tympanomastoidectomy and she participated in physical therapy to improve balance and unsteadiness (Exhibit B1F). Additional surgery was expected (Exhibit B1F). The claimant underwent left tympanoplasty with OCR and left tragal cartilage graft in January 2016

9

and right sided cholesteatoma in January 2016 (Exhibit B9F, pp.404-411). When seen in February 2016, she was doing well post 2 nd stage tympanomastoidectomy with ossicular reconstruction (Exhibit B9F, p.14). She was seen in October 2016 prior to undergoing left ossiculoplasty. At this time, hearing loss in the left ear was noted (Exhibit B9F, p.204). In December 2016, she reported that her hearing had improved, however, and she was not having issues with imbalance (Exhibit B9F, p.257). In May 2018, she was having drainage from her right ear and she underwent excisional biopsy in July 2018 (Exhibit B3F, pp.66,72). Biopsy results were benign (Exhibit B3F, p.60). By August 2018, she appeared to be "well-healed." (Exhibit B3F, p.52). An audiogram was noted to show residual air bone gap on the right (Exhibit B3F, p.52). Revision ossiculoplasty was discussed for the future (Exhibit B3F, p.52). On or around the alleged onset date in October 2018, the claimant underwent an ear recheck after lesion removal (Exhibit B3F, p.48). She wanted to pursue the revision ossiculoplasty. After this, her ear canal appeared to be well healed without recurrence of lesion (Exhibit B3F, p.48). In January 2019 when seen at Geisinger, she was doing well. She denied ear pain and ongoing ringing in her ear. She did note, however, that she had the same "droning" ringing that she had since 2013 that was unchanged (Exhibit 3F, p.37). In January 2019, she had undergone right revision tympanoplasty with ossicular chain reconstruction (Exhibit B3F, pp.26,34). In February 2019, she reported that she was doing well. There was no pain, drainage or dizziness. She noted "significant improvement in hearing" (Exhibit B3F, p.29). Records in April 2019 reflect that she was concerned about her weight. She also described that she was riding a stationary bike and planning to ride her outdoor bike, and she was doing the food shopping (Exhibit B3F, pp.24,25). These activities support more function than alleged by the claimant. By May 2019, an audiogram showed mild improvement in conductive component of hearing loss on the right (Exhibit B3F, p.22).

(Tr. 23-24).

The ALJ also detailed the medical opinion evidence concerning Sevilla's emotional impairments, finding that:

Both State agency psychological consultants reviewed the record and found that there were no severe mental health impairments. Upon initial review and upon reconsideration, Dr. Paul Taren and Dr. Frank Mrykalo both opined that the claimant had no limitations in the ability to understand, remember, or apply information, or in the ability to interact with others. They both assessed mild limitations in the ability to concentrate, persist or maintain pace, and mild limitations in the ability to adapt or manage oneself (Exhibits B2A; B4AA). These opinions are persuasive as seen in the above summarized mental treatment notes at Exhibits B2F; B7F; and B8F that routinely documented normal findings. The claimant has also been able to work parttime with others in a home care setting. Although not substantial gainful activity, this is evidence of higher function than alleged.

(Tr. 26).

Having reached these conclusions regarding the medical, clinical, and opinion evidence, the ALJ found at Step 4 that Sevilla could return to her past sedentary work as a collection agent or school secretary. (Tr. 27). Accordingly, the ALJ determined that Sevilla had not met the demanding showing necessary to sustain this claim for benefits and denied this claim. (Id.)

This appeal followed. (Doc. 1). On appeal, Sevilla challenges the adequacy of the ALJ's decision, arguing that ALJ's residual functional capacity assessment failed to account for what were described as mild mental and emotional impairments and did not adequately take into account her hearing impairments. Aside from these merits-based contentions, Sevilla also asserts that there is a structural legal flaw in the appointment process for the Commissioner of Social Security which also entitles

her to a remand of her case. This appeal is fully briefed by the parties and is, therefore, ripe for resolution. As discussed in greater detail below, having considered the arguments of counsel, carefully reviewed the record, and remaining mindful of the deferential standard of review which applies here, we conclude that the ALJ's decision is supported by substantial evidence. Accordingly, we will affirm the decision of the Commissioner denying this claim.

## III.   <u>Discussion</u>

### A.   <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  <u>See</u> 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F.Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a

conflict created by the evidence. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." <u>Consolo v. Fed. Maritime Comm'n</u>, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." <u>Leslie v. Barnhart</u>, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. <u>T-Mobile South, LLC v. Roswell</u>, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." <u>Ibid.</u>; <u>see, e.g., Perales</u>, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S.Ct. 206. <u>See Dickinson v. Zurko</u>, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

<u>Biestek</u>, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See <u>Arnold v. Colvin</u>, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); <u>Burton v. Schweiker</u>, 512 F.Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); <u>see also</u> <u>Wright v. Sullivan</u>, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); <u>Ficca</u>, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." <u>Zirnsak v. Colvin</u>, 777 F.3d 607, 611 (3d Cir. 2014) (citing <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the

burden of articulation demanded by the courts to enable informed judicial review.

Simply put, "this Court requires the ALJ to set forth the reasons for his decision."

Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the

Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for
> his decision. 220 F.3d at 119. Conclusory statements . . . are
> insufficient. The ALJ must provide a "discussion of the evidence" and
> an "explanation of reasoning" for his conclusion sufficient to enable
> meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d
> 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ
> particular "magic" words: "Burnett does not require the ALJ to use
> particular language or adhere to a particular format in conducting his
> analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the

ALJ's decision under a deferential standard of review, but we must also give that

decision careful scrutiny to ensure that the rationale for the ALJ's actions is

sufficiently articulated to permit meaningful judicial review.

### B.   Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a

claimant must demonstrate an inability to "engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett, 220 F.3d at 121 (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018); Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in

engaging in any of his or her past relevant work. <u>Mason</u>, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.  20 C.F.R. §§404.1512(f), 416.912(f); <u>Mason</u>, 994 F.2d at 1064.

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and state that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." <u>Biller v. Acting Comm'r of Soc. Sec.</u>, 962 F.Supp.2d 761, 778–79 (W.D. Pa. 2013) (quoting <u>Gormont v. Astrue</u>, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." <u>Titterington v. Barnhart</u>, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical

opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F.Supp.3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting, like that presented here, where well-supported medical sources have opined regarding limitations which would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when no medical opinion supports a disability finding or when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living to fashion an RFC, courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington, 174 F. App'x 6; Cummings, 129 F.Supp.3d at 214–15. In either event, once the ALJ

19

has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns, 312 F.3d 113; see also Rathbun, 2018 WL 1514383, at *6; Metzger, 2017 WL 1483328, at *5.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

C.    **Legal Benchmarks for the ALJ's Assessment of a Claimant's Alleged Symptoms**

The interplay between the deferential substantive standard of review that governs Social Security appeals, and the requirement that courts carefully assess

whether an ALJ has met the standards of articulation required by law, is also illustrated by those cases which consider analysis of a claimant's reported pain. When evaluating lay testimony regarding a claimant's reported degree of pain and disability, we are reminded that:

> [T]he ALJ must necessarily make certain credibility determinations, and this Court defers to the ALJ's assessment of credibility. See Diaz v. Comm'r, 577 F.3d 500, 506 (3d Cir. 2009) ("In determining whether there is substantial evidence to support an administrative law judge's decision, we owe deference to his evaluation of the evidence [and] assessment of the credibility of witnesses...."). However, the ALJ must specifically identify and explain what evidence he found not credible and why he found it not credible. Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir.1994) (citing Stewart v. Sec'y of Health, Education and Welfare, 714 F.2d 287, 290 (3d Cir. 1983)); see also Stout v. Comm'r, 454 F.3d 1050, 1054 (9th Cir. 2006) (stating that an ALJ is required to provide "specific reasons for rejecting lay testimony"). An ALJ cannot reject evidence for an incorrect or unsupported reason. Ray v. Astrue, 649 F.Supp.2d 391, 402 (E.D. Pa. 2009) (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)).

Zirnsak v. Colvin, 777 F.3d 607, 612–13 (3d Cir. 2014).

> Yet, it is also clear that:

> Great weight is given to a claimant's subjective testimony only when it is supported by competent medical evidence. Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979); accord Snedeker v. Comm'r of Soc. Sec., 244 Fed.Appx. 470, 474 (3d Cir. 2007). An ALJ may reject a claimant's subjective testimony that is not found credible so long as there is an explanation for the rejection of the testimony. Social Security Ruling ("SSR") 96–7p; Schaudeck v. Comm'r of Social Security, 181 F.3d 429, 433 (3d Cir. 1999). Where an ALJ finds that there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the

individual's pain or other symptoms, however, the severity of which is not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

McKean v. Colvin, 150 F. Supp. 3d 406, 415–16 (M.D. Pa. 2015) (footnotes omitted). Thus, we are instructed to review an ALJ's evaluation of a claimant's subjective reports of pain under a standard of review which is deferential with respect to the ALJ's well-articulated findings but imposes a duty of clear articulation upon the ALJ so that we may conduct meaningful review of the ALJ's conclusions.

In the same fashion that medical opinion evidence is evaluated, the Social Security Rulings and Regulations provide a framework under which the severity of a claimant's reported symptoms are to be considered. 20 C.F.R. §§ 404.1529, 416.929; SSR 16–3p. It is important to note that though the "statements of the individual concerning his or her symptoms must be carefully considered, the ALJ is not required to credit them." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 363 (3d. Cir. 2011) (referencing 20 C.F.R. §404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled."). It is well-settled in the Third Circuit that "[a]llegations of pain and other subjective symptoms must be supported by objective medical evidence." Hantraft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (referring to 20 C.F.R. §404.1529). When evaluating a claimant's

symptoms, the ALJ must follow a two-step process in which the ALJ resolves whether a medically determinable impairment could be the cause of the symptoms alleged by the claimant, and subsequently must evaluate the alleged symptoms in consideration of the record as a whole. SSR 16-3p.

First, symptoms, such as pain or fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. §§ 404.1529(b), 416.929(b); SSR 16–3p. During the second step of this credibility assessment, the ALJ must determine whether the claimant's statements about the intensity, persistence or functionally limiting effects of his or her symptoms are substantiated based on the ALJ's evaluation of the entire case record. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p. This includes but is not limited to medical signs and laboratory findings, diagnosis and other medical opinions provided by treating or examining sources, and other medical sources, as well as information concerning the claimant's symptoms and how they affect his or her ability to work. Id. The Social Security Administration has recognized that individuals may experience their symptoms differently and may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings. SSR 16–3p.

Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations identify seven factors which may be relevant to the assessment of the severity or limiting effects of a claimant's impairment based on a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). These factors include: activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her symptoms; treatment, other than medication that a claimant has received for relief; any measures the claimant has used to relieve his or her symptoms; and, any other factors concerning the claimant's functional limitations and restrictions. Id.; see George v. Colvin, No. 4:13–CV–2803, 2014 WL 5449706, at *4 (M.D. Pa. Oct. 24, 2014); Koppenaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1995999, at *9 (M.D. Pa. Apr. 8, 2019), report and recommendation adopted sub nom. Koppenhaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1992130 (M.D. Pa. May 6, 2019);Martinez v. Colvin, No. 3:14-CV-1090, 2015 WL 5781202, at *8–9 (M.D. Pa. Sept. 30, 2015).

### D.   **Legal Benchmarks for the ALJ's Assessment of Medical Opinions**

The plaintiff filed this disability application in April of 2017 shortly after a paradigm shift in the manner in which medical opinions were evaluated when

assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March 0f 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

> Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the

25

foundation of the treating source rule. <u>Revisions to Rules</u>, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." <u>Id</u>. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." <u>Id</u>. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. <u>Id</u>. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). <u>Id</u>. at §§ 404.1520c(b)(3), 416.920c(b)(3).

<u>Andrew G. v. Comm'r of Soc. Sec.</u>, No. 3:19-CV-0942 (ML), 2020 WL 5848776, at

*5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions.

Judicial review of this aspect of ALJ decision-making is still guided by several

settled legal tenets. First, when presented with a disputed factual record, it is well-

established that "[t]he ALJ – not treating or examining physicians or State agency

consultants – must make the ultimate disability and RFC determinations." <u>Chandler v. Comm'r of Soc. Sec.</u>, 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions " the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" <u>Morales v. Apfel</u>, 225 F.3d 310, 317 (3d Cir. 2000) (quoting <u>Mason</u>, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. <u>See</u> <u>Thackara v. Colvin</u>, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); <u>Turner v. Colvin</u>, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); <u>Connors v. Astrue</u>, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. <u>See e.g., Thackara v. Colvin</u>, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

<u>Durden v. Colvin</u>, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." <u>Cummings</u>, 129 F.Supp.3d at 214–15.

It is against these legal guideposts that we assess the ALJ's decision in the instant case.

### E.     The Decision of the ALJ Should Be Affirmed on Its Merits.

In this setting we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence," Pierce, 487 U.S. at 565, but rather "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Biestek, 139 S. Ct. at 1154. Judged against these deferential standards of review, we are constrained to find that substantial evidence supported the ALJ's decision that Sevilla was not entirely disabled.

In this case, Sevilla attacks the ALJ's RFC determination, insisting that the ALJ failed to adequately consider her hearing loss and mild emotional impairments. However, we are reminded that our " 'review of the ALJ's assessment of the [claimant]'s RFC is deferential,' and the 'RFC assessment will not be set aside if it is supported by substantial evidence.' " Stancavage v. Saul, 469 F. Supp. 3d 311, 339 (M.D. Pa. 2020). In the instant case, we find that the ALJ's assessment of the

evidence complied with the dictates of the law and was supported by substantial evidence, a term of art which means less than a preponderance of the evidence but more than a mere scintilla, <u>Richardson</u>, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce</u>, 487 U.S. at 565.

In particular, given the medical expert consensus that Sevilla's emotional impairments were not severe, it cannot be said that the ALJ erred in relying upon this uncontradicted expert opinion evidence when reaching this decision denying her claim. While Sevilla argues that the failure to expressly address some of her mild impairments in crafting the RFC in this case was reversible error, we disagree. Rather, we agree with those cases which have held that isolated non-severe, mild emotional impairments do not have to be explicitly addressed by an ALJ when fashioning the residual functional capacity for a claimant. <u>See, e.g.</u>, <u>Northrup v. Kijakazi</u>, No. 20-cv-00412, 2022 WL 889968 (M.D. Pa. Mar. 24, 2022); <u>Maddy v. Saul</u>, No. CV 18-261, 2020 WL 516303, at *3 (W.D. Pa. Jan. 31, 2020); <u>Redhead v. Berryhill</u>, No. CV 17-639, 2018 WL 1911370, at *4 (W.D. Pa. Apr. 23, 2018); <u>Shaffer v. Colvin</u>, No. 13-925, 2014 WL 4925067, *5-6 (W.D. Pa. Sept. 30, 2014). Likewise, the ALJ's decision acknowledged Sevilla's hearing impairment and made

some accommodations for it by providing that she must avoid concentrated exposure to noise above a moderate level. Given the clinical evidence, which indicated that in February of 2019, Sevilla described "significant improvement in hearing," (Tr. 387), and reflected that in March of 2019 Sevilla reported that she noted improvement in hearing (Tr. 384), this RFC accommodation adequately addressed Sevilla's hearing issues. Further, this RFC assessment was informed by and supported by Sevilla's activities of daily living, which included her part-time employment. There was no error here.

This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the plaintiff's argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.' " Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case. Therefore, when

this decision is considered on its merits under the applicable standard of review, that the decision should be affirmed.

### E.    A Remand is Not Necessary Based Upon Separation of Powers Considerations.

Finally, the plaintiff contends that the ALJ's authority was constitutionally defective, in that the ALJ derives his power from the Commissioner of Social Security, and the Commissioner of Social Security was not constitutionally appointed. Specifically, the plaintiff contends that she was not afforded a valid administrative adjudicatory process because her claim was denied by an ALJ who was appointed by a Commissioner whose appointment was constitutionally defective. In advancing this claim the plaintiff relies on the Supreme Court's decision in Seila Law LLC v. CFPB, 140 S. Ct. 2183 (2020). In Seila Law, the Supreme Court found that the Consumer Financial Protection Bureau's removal structure violated the separation of powers, as that structure essentially insulated the director of the CFPB from removal by the President except for cause. Id. at 2197. Moreover, in Collins v. Yellen, 141 S. Ct. 1761 (2021), the Supreme Court held a removal provision which only allowed for the President to remove the director of the Federal Housing Finance Agency only for cause violated the separation of powers. Id. at 1783.

Like these other constitutionally infirm removal statutes, it appears that the Social Security Act limits the removal of the Commissioner only for cause. See 42 U.S.C. § 902(a)(3) ("An individual serving in the office of Commissioner may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office"). Moreover, at least one court within this circuit has found that the removal provision for the Commissioner of the SSA would seem to violate the separation of powers. See Stamm v. Kijakazi, 577 F. Supp. 3d 358, 366 (M.D. Pa. 2021) ("Applying the holdings in Seila Law and Collins here makes it clear that the provision for removal of the Commissioner of Social Security, 42 U.S.C. § 902(a)(3), violates the separation of powers").

Yet while the structure of the Social Security Act's retention and removal provisions may foster some separation of powers concerns, what is less apparent is how those concerns provide Sevilla with grounds to set aside this ALJ's decision. In this regard, other courts have taken the approach embraced by the Court in Collins and held that Social Security plaintiffs typically do not have standing to challenge the separation of powers violation, as these plaintiffs could not show that the removal clause caused them a specific traceable injury. Indeed, in Collins, the Supreme Court found that "whenever a separation-of-powers violation occurs, any aggrieved party *with standing* my file a constitutional challenge." Collins, 141 S. Ct. at 1780

32

(emphasis added). As applied to Social Security plaintiffs, one court has aptly explained:

> In Collins, the Directors of the FHFA adopted an amendment (the "Third Amendment") to certain financial agreements that "materially changed the nature of the agreements" and resulted in the companies in which plaintiffs were shareholders transferring to the U.S. Treasury "at least $124 billion dollars more than the companies would have had to pay" under the prior form of the agreements. Id. at 1774. The plaintiffs in Collins thus had an identifiable basis to contend that but for the unconstitutional removal provision, the President may have removed and appointed a different Director who would have disapproved of the adoption (or implementation) of the Third Amendment. See id. at 1789.

> In contrast, there is nothing showing the Commissioner or the SSA implemented new and relevant agency action that may have turned upon the President's inability to remove the Commissioner. Plaintiff has not identified any new regulations, agency policies or directives Commissioner Saul installed that may have affected her claims. Plaintiff thus fails to show how or why § 902(a)(3) removal clause possibly harmed her.

Wicker v. Kijakazi, 2022 WL 267896, at *10 (E.D. Pa. Jan. 28, 2022) (quoting Lisa Y. v. Comm'r of Soc. Sec., -- F.Supp.3d --, 2021 WL 5177363, at *7 (W.D. Wash. Nov. 8, 2021)).

Thus, following Collins, many courts in this circuit have found that Social Security plaintiffs do not have standing to make a separation of powers challenge because they cannot show a nexus between the unconstitutional removal provision and some compensable harm in their particular cases. See e.g., Rowe v. Kijakazi,

No. 3:21-CV-01511, 2023 WL 2742747, at *4 (M.D. Pa. Mar. 31, 2023); Houck v. Kijakazi, No. 3:21-CV-01470, 2023 WL 2594965, at *4 (M.D. Pa. Mar. 3, 2023), report and recommendation adopted, No. 3:21-CV-01470, 2023 WL 2590967 (M.D. Pa. Mar. 21, 2023); Russell v. Kijakazi, No. 3:21-CV-01873, 2023 WL 2623759, at *4 (M.D. Pa. Mar. 2, 2023), report and recommendation adopted, No. 3:21-CV-1873, 2023 WL 2614626 (M.D. Pa. Mar. 23, 2023); Jones v. Kijakazi, 2022 WL 1016610, at *12 (D. Del. April 5, 2022) ("Plaintiff does not articulate how the President's inability to remove the Commissioner without cause affected the ALJ's disability determination in this case") Adams v. Kijakazi, 2022 WL 767806, at * 11 (E.D. Pa. Mar. 14, 2022) ("Plaintiff has failed to establish any nexus between the removal restriction and the denial of her application for benefits"); Kowalski v. Kijakazi, 2022 WL 526094, at *11 (M.D. Pa. Feb. 22, 2022) (Mehalchick, M.J.) ("There is no allegation suggesting a direct nexus between the adjudication of Kowalski's disability claim by the ALJ and the alleged separation of powers violation in the removal statute that applies to the Commissioner").

We will follow this rising tide of caselaw. In the instant case, the plaintiff simply contends that she was not afforded a valid administrative adjudicatory process because the removal structure for the Commissioner of Social Security is unconstitutional. However, as this recent caselaw illustrates, much more is needed

than a generalized assertion that the unconstitutionality of the removal clause requires a remand. Rather, the plaintiff must show that the removal structure itself caused her harm. We find this reasoning persuasive and conclude that the plaintiff has not shown the requisite harm to prevail on this separation of powers claim. Indeed, the plaintiff here does not point to any changes in the regulations or updated guidance that would have benefitted her had Acting Commissioner Kijakazi been appointed earlier, and thus, cannot establish any specific, particularized compensable harm. Accordingly, we find that these removal provision concerns do not warrant a remand of this case.

## IV.   **Conclusion**

For the foregoing reasons, the decision of the Commissioner in this case will be affirmed and the plaintiff's appeal denied.

An appropriate order follows.

*/S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: July 24, 2023